J-A19004-25

2025 PA Super 219

| | | |
|---|---|---|
| IN RE:  ADOPTION OF: B.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  M.M.B. AND T.D.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 238 WDA 2025 |

Appeal from the Order Dated January 31, 2025
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No. 059 of 2024

BEFORE:  BOWES, J., STABILE, J., and BENDER, P.J.E.

OPINION BY BENDER, P.J.E.:                **FILED: September 29, 2025**

M.M.B. (Mother) and T.D.B. (Stepfather) (collectively, Appellants) appeal from the order denying their petition to terminate the parental rights of C.M.B. (Father) to B.A.S. (Child).  We affirm.

CASE HISTORY

Mother and Father were in a relationship from February 2012 until "some point in 2014."  Orphans' Court Opinion (OCO), 1/31/25, at 2 (unnumbered).  Child was born in January 2014.  After Child's birth, Child and Mother lived with Mother and her parents (Maternal Grandparents) in Maternal Grandparents' home.  *Id.*  Father visited Child at Maternal Grandparents' home and brought Child to his parents' home for visits.  *Id.*

The orphans' court explained the following procedural history:

In July 2017, Mother filed a Petition for Protection from Abuse (PFA) against Father.  The parties agreed through an Order of Court dated July 17, 2017, that if Father did not violate the

Temporary PFA, it would expire on October 30, 2017. Father violated the Temporary PFA, was arrested, and charged with [i]ndirect [c]riminal [c]ontempt. He pled guilty to violating the PFA order.

Father was arrested in July of 2017[,] and his contact with [C]hild ceased.

On August 11, 2017, Mother filed a Complaint for Custody[,] seeking sole legal and sole physical custody of [C]hild. Mother filed a Petition for Emergency Relief the same day which was granted pending a hearing scheduled for September 13, 2017. By Order of Court dated August 30, 2017, the parties reached an agreement to reschedule the custody conciliation conference for March 1, 2018. Father tested positive for [m]arijuana and [c]ocaine at the custody conciliation conference held March 1, 2018. On March 6, 2018, an Order of Court was issued granting Mother sole legal and primary physical custody of [C]hild. Father was ordered to have supervised visitation through Justice Works Youth Care and undergo a drug and alcohol evaluation.

Father filed a Petition for Modification of a Custody Order on August 14, 2020[,] arguing that he had addressed all of the [c]ourt's concerns by attending parenting classes, participating in anger management classes, and undergoing drug and alcohol treatment. A custody conciliation conference was scheduled for October 15, 2020. Counsel for Mother filed a Motion for Reconciliation Therapy on September 30, 2020[,] which was presented [on] October 7, 2020. Father's visits through Justice Works were put on hold until an Order of Court was issued following the custody conciliation conference noted above.

[On] November 4, 2020[,] an Order of Court was issued granting Mother sole legal and primary physical custody of [C]hild. Father and [C]hild were to participate in Parent/Child Reconciliation Therapy at In-Clusion. Father and [C]hild were to attend a minimum of 4 sessions and both parties were required to pay for said sessions. Father was to continue receiving mental health treatment.

Father filed a second Petition for Modification of a Custody Order on March 5, 2021, after completing all the required Parent/Child reunification therapy sessions. A custody conciliation conference was scheduled for April 30, 2021.

[On] May 4, 2021[,] an Order of Court was issued granting Mother sole legal custody and primary physical custody of [C]hild. Father was awarded supervised visits every Saturday from 12:00 p.m. until 4:00 p.m.[,] along with one weeknight per week from 5:00 p.m. until 8:00 p.m. Father's supervised visits were to be supervised by his [a]unt…. Father was ordered to continue following his mental health treatment recommendations.

[On] June 2, 2021, Father filed a Praecipe for Pretrial Conference which was scheduled for August 10, 2021. At the pretrial conference, Father's periods of partial physical custody were modified to one evening per week from 5:00-8:00 p.m.[,] and his Saturday time was changed to 12:00 p.m. until 5:00 p.m. Father was ordered to provide documentation of his mental health treatment within 30 days. A second pretrial conference was scheduled for November 10, 2021.

The parties entered into a Custody Consent Order on November 12, 2021. The Order modified Father's periods of partial physical custody to one unsupervised evening per week from 5:00 p.m. until 8:00 p.m. Father's Saturday visitation time was expanded to 10:00 a.m. until 6:00 p.m. Father was also provided one unsupervised overnight per month to be arranged by the parties. Father was again ordered to provide proof of participation in mental health treatment.

Father's last visit with [C]hild was in August of 2022, prior to his arrest, and Father's period of incarceration began in October of 2022.

*Id.* at 2-4.

Father was incarcerated from October 2022 until July 2024. *Id.* at 10. On June 20, 2024 — approximately one month prior to Father's release — Appellants filed a petition which alleged, *inter alia*, grounds for termination under 23 Pa.C.S. § 2511(a)(1) and (2). The orphans' court appointed a guardian *ad litem* (GAL), and determined that the GAL could "effectively represent [C]hild's legal interests." *See* OCO at 5 n.1; *In re Adoption of K.M.G.*, 240 A.3d 1218, 1224 (Pa. 2020) (stating that a GAL may represent

a child's legal interests "so long as the child's legal interests do not conflict with the attorney's view of the child's best interests").

A termination hearing was held on December 12, 2024. The orphans' court heard testimony from Westmoreland County Prison Lieutenant Curtis Tringhese, Mother, Stepfather, and Father. The court also heard from the GAL.

Much of the testimony concerned Father's phone calls to Child during his incarceration. The parties agreed that the calls would be made to Stepfather's phone. OCO at 9. Lieutenant Tringhese produced and authenticated prison phone records which the orphans' court admitted into evidence. N.T., 12/12/24, at 4, 20. Lieutenant Tringhese testified that there were "37 attempted calls" from Father to Child. *Id.* at 5. The first call was attempted on November 6, 2023, and the last call was attempted on July 1, 2024. *Id.* at 10.

Mother testified that Father stopped seeing Child after his arrest in July 2017. *Id.* at 40. She confirmed that Father's visits resumed in January 2021, and Father obtained additional custody, including overnight visits, after the parties entered a consent order on November 21, 2021. *Id.* at 46, 51. Mother also confirmed that Father's custody ceased in August 2022, when Father incurred new criminal charges. *Id.* at 55.

Mother testified that following Father's incarceration, Father's grandmother contacted her on Father's behalf to request phone calls with Child. *Id.* at 89. When Father's counsel asked about "whether there was any

reference to [calls occurring on] the first Monday of the month," Mother replied, "That sounds about right, but those weren't always consistent." *Id.* at 90. Mother testified that Father occasionally called Child and occasionally sent letters. *Id.* at 58-59, 70. Mother could not recall the dates or frequency of Father's letters. *Id.* at 95. She stated that when Father spoke with Child, he would "ask about things in her life, about how school is going and things like that." *Id.* at 76. When Father's counsel asked Mother about prison phone records showing Father's calls that were "not accepted," Mother replied that "maybe we weren't by the phone," and stated that she did not remember "hitting not accepted." *Id.* at 93. Mother acknowledged from phone records that Father attempted to call Child four times on January 1, 2024. *Id.* at 110. One of the calls was successful and Father spoke with Child for five minutes. *Id.* at 130. Mother did not remember a call Father made on March 4, 2024, which appeared on the phone record as "refused." *Id.* at 110. Stepfather subsequently testified that he had refused the call because he was asked "to pay money for the call to continue." *Id.* at 120.

Father explained he filed the petition to modify custody in 2021, because he "wanted more involvement in [Child's] life and felt that my[his] relationship with her at the time was progressing a lot from where it was." *Id.* at 143. Father confirmed he and Mother entered into the November 21, 2021 order, which provided him with "one evening per week from five to eight unsupervised," and "an expanded period of time on Saturday unsupervised from ten to six[,] and one unsupervised overnight per month." *Id.* at 146.

According to Father, he and Mother "agreed things were going smooth, so this is the way we tried it, and that was the agreement…." *Id.* at 147. However, Father conceded he has not seen Child since August 2022, when he incurred the criminal charges which led to him being incarcerated through July 2024. *Id.* at 148.

Father testified to believing that he and Mother had an agreement that he would call Child on the first Monday of every month. *Id.* at 151. He explained that he had to pay for calls, but got "a free promotional call the first Monday…, so that's kind of why the Monday thing was in place. I knew I'd get a call on that Monday, so I could use it." *Id.* at 152. He added that he "used the free promotional calls … because I didn't want to have to ask them to pay for the calls." *Id.* at 156. Father testified that he "didn't always call on the first of every month" because he needed Wi-Fi, which "doesn't always work in prison." *Id.* at 151. Father testified that he did not attempt to use video chat or arrange in-person visits with Child, and stated that he would not want Child to see him in prison. *Id.* at 171.

At the conclusion of the hearing, the GAL recounted meeting with Child, who relayed that Father had "sent letters" and made "a few phone calls." *Id.* at 203. The GAL advised that Child wished to be adopted by Stepfather, and "understands that it's up to [M]other and [Stepfather], at the time of the adoption, as to whether there will be any contact with [Father], and [Child is] all right with that." *Id.* at 205. The GAL added, "if there's no contact with

[Father], [Child] would like to have contact with her cousins and great-grandmother." *Id.* at 206.

Based on the evidence, the orphans' court found:

Father first became incarcerated in 2017[,] but it is unclear as to how long Father was incarcerated [at the time]. From the onset of the custody action, Father has utilized his periods of physical custody [of C]hild unless he was incarcerated. Father completed the ordered Parent/Child Reconciliation Therapy and then moved to supervised visits with [C]hild.

Father continued to progress in his relationship with [C]hild and continued to pursue additional custody time. In November of 2021, Father continued making progress and requested additional time with [C]hild, as evidenced by Father's filing for custody modifications. Father testified that during his supervised and unsupervised periods of custody of [Child], he took [C]hild to the park, went shopping, and visited amusement parks. [C]hild celebrated holidays and birthdays with Father's extended family. Father stated that the visits with [C]hild were going well until his arrest in August of 2022.

While incarcerated, Father attended Narcotics Anonymous meetings and attended church. Father informed the [c]ourt that there were waitlists for participating in jail programs and that Westmoreland County Prison no longer offered an Intensive Outpatient Program. Father was released from incarceration July of 2024. Upon release, Father went to Greenbriar Treatment Center in Waynesburg, Pennsylvania[,] to participate in their 90-day rehabilitation program. Father testified that since his release from Greenbrier, he has been actively searching for employment and is currently residing with Paternal Grandmother. It was recommended that Father continue to participate in an Intensive Outpatient Program. Father testified that he is currently participating in a step-down program through Well-Life Services and attends one session every other week. Father stated that since his release, he has not paid any child support.

OCO at 5-6.

The orphans' court noted that the GAL recommended terminating Father's rights. *Id.* at 6. The court recounted the GAL stating that Child wanted to be adopted by Stepfather and "continue seeing members of Father's family, [but did] not care about seeing Father." *Id.*

On January 31, 2025, the orphans' court issued an order and opinion denying Appellants' petition to terminate Father's parental rights. The court determined that Appellants failed to prove grounds for termination under 23 Pa.C.S. § 2511(a)(1) and (2). The court also found that termination was contrary to Child's needs and welfare under 23 Pa.C.S. § 2511(b).[1]

On February 25, 2025, Appellants filed a notice of appeal and concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i). Appellants present the following question for review:

> I. DID THE [ORPHANS'] COURT COMMIT ERROR WHEN IT DENIED THE REQUEST FOR THE TERMINATION OF [FATHER'S] PARENTAL RIGHTS UNDER 23 PA.C.S.[] SECTION 2511(a)(1)[,] WHERE THE CLEAR AND CONVICING EVIDENCE IN THE RECORD ESTABLISHED THAT, WHILE INCARCERATED FOR 20 MONTHS, [FATHER] FAILED TO UTILIZE ALL AVAILABLE RESOURCES TO PRESERVE THE PARENTAL RELATIONSHIP AND FAILED TO EXERCISE REASONABLE FIRMNESS IN RESISTING ANY OBSTACLES IN THE PATH OF MAINTAINING A PARENT-CHILD RELATIONSHIP WITH [CHILD]?

Appellants' Brief at 6.

---

[1] An analysis of a child's needs and welfare under 23 Pa.C.S. § 2511(b) typically occurs "after the statutory requirements of section 2511(a) have been met." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citations omitted).

DISCUSSION

In cases involving termination of parental rights, appellate review is limited to whether the decision is supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). We must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). Where the factual findings are supported by the evidence, an appellate court may not disturb the ruling unless it has discerned an error of law or abuse of discretion. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* (citations omitted). This Court will not re-weigh evidence, and we may not reverse a decision "merely because the record could support a different result." *In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*).

Termination of parental rights is governed by Section 2511 of the Adoption Act. *See generally* 23 Pa.C.S. § 2511. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). In this case, the orphans' court found that Appellants failed to prove their alleged grounds for termination under Section 2511(a)(1) and (2). Appellants do not challenge the court's finding regarding

Section 2511(a)(2), but claim that the court erred with respect to Section 2511(a)(1).

Section 2511(a)(1) permits termination "upon establishing parental abandonment." *In re Adoption of L.A.K.*, 265 A.3d at 583 (citing 23 Pa.C.S. § 2511(a)(1)). Section 2511(a)(1) states that a parent's rights may be terminated when:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1). A "wealth of Superior Court jurisprudence instructs trial courts deciding Subsection 2511(a)(1) cases to consider the whole history of a given case and 'not mechanically apply the six-month statutory provision[,]' although 'it is the six months immediately preceding the filing of the petition that is most critical to the analysis.'" *In re Adoption of C.M.*, 255 A.3d at 364 (citations omitted).

When considering a request to terminate rights under Section 2511(a)(1), a parent's failure or refusal to perform parental duties must be analyzed in relation to the particular circumstances of the case. *In re Adoption of L.A.K.*, 265 A.3d at 592. A parent's efforts "are always considered 'in light of existing circumstances.'" *Id.* (citations omitted). The "focus of the inquiry is whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have

prevented the performance of parental duties." *Id.* at 592–93 (citations omitted). The Supreme Court explained:

> [E]ven where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court "must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights]." Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). We reiterate that the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving [the] needs and welfare of each individual child in his or her particular circumstances. It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case. In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship. In other instances, trial courts have found substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues created barriers to the maintenance of the parent-child relationship. In all instances, the trial court considered the explanation offered by the parent when deciding whether termination of parental rights was warranted.

*Id.* at 593 (citations omitted).

In this case, Father was incarcerated from October 2022 until July 2024. Appellants recognize that Father's incarceration includes the six-month period preceding the filing of their petition on June 20, 2024. Appellants argue:

> The evidence in this case was clear and convincing that [Father] did so little to maintain a relationship with [Child] in the 20 months that he was [incarcerated] that he, as a matter of law, cannot have been found to have made any sincere or persistent efforts to inquire about, remain in contact with, or try to maintain a close relationship with [Child] and, for that reason, the [orphans'] court erred when [it] did not terminate the parental rights of [Father] under 23 Pa.C.S.[] Section 2511(a)(1).

Appellants' Brief at 27-28.

In the first half of their argument, Appellants discuss termination in general legal terms. *See id.* at 29-36. In the second half of their argument, Appellants emphasize evidence which they view as clearly and convincingly supporting grounds for termination under Section 2511(a)(1). *Id.* at 29-45.

Similar to Appellants, the GAL argues:

> [Appellants] have shown by evidence that is both clear and convincing that Father, by his conduct during his incarceration, and more specifically, in the six months prior to the filing of the [p]etition to [t]erminate [p]arental [r]ights, failed to maintain a place of importance in [C]hild's life.

> The needs and welfare of [C]hild will be furthered by [termination], so that [S]tepfather, who acted as her father since he became part of the family in 2019, may adopt her.

GAL's Brief at 1. The GAL states, "Father has been unavailable for [Child] during most of her life. During this time, [Child] has looked to [Stepfather]

- 12 -

to fulfill the role of father in her life." ***Id.*** at 10. The GAL emphasizes Child's needs and welfare.[2]

Father argues that the orphans' court "correctly analyzed the facts in reaching its decision." Father's Brief at 11. Father refers to the undisputed evidence that he called Child and sent letters; he also references his testimony that he believed video chats from prison and in-person visits were not suitable for Child. ***Id.*** at 13-14. Father notes his completion of available prison programs, and his participation in drug and alcohol treatment "aftercare" following his release. ***Id.*** at 14. Thus, Father maintains that the court did not err in deciding that Appellants failed to prove grounds for termination under Section 2511(a)(1). ***Id.***

Although Section 2511(a)(1) requires consideration of a parent's conduct "at least six months immediately preceding the filing of the petition," a "wealth of Superior Court jurisprudence instructs trial courts … to consider the whole history of a given case and 'not mechanically apply the six-month statutory provision.'" ***In re Adoption of C.M.***, 255 A.3d at 364 (citations omitted). Here, the orphans' court referenced Father's prior efforts and success in obtaining custody of Child. ***See*** OCO at 5-6; ***In re Adoption of L.A.K.***, 265 A.3d at 594 (reiterating that a parent's efforts to enforce his

---

[2] We note that a GAL is not a judicial or quasi-judicial officer, and the orphans' court is not bound by a GAL's recommendation. ***See C.W. v. K.A.W.***, 774 A.2d 745, 749 (Pa. Super. 2001). It is the sole function of the orphans' court "to interpret the law, determine the facts[,] and apply the facts to the law." ***Id.***

custody rights "unquestionably establishes the affirmative performance of a positive parental duty"). The orphans' court noted Father's testimony that "visits with [C]hild were going well until his arrest in August of 2022." OCO at 6.

In addition, the orphans' court recognized that "[i]ncarceration alone is not sufficient to support termination," and "is but one factor" the court must consider. *Id.* at 7. The court explained:

> Father testified that while incarcerated, he has maintained contact with [C]hild. It is uncontested that Father wrote letters to [C]hild while incarcerated. Mother's testimony conceded he had written [C]hild letters. Mother stated that sometimes Father would send multiple letters at once and then Father would go an entire month without sending a letter. Mother testified that on occasion she unilaterally withheld the letters from [C]hild if she did not agree with the letter's content. In the letters[,] Father would ask [C]hild for forgiveness or ask [C]hild not to be mad at him. Mother did not think this was suitable for [C]hild's well-being and felt that it placed pressure upon [C]hild. As evidenced through a text exchange between Mother and Paternal Grandmother dated August 28, 2023, Mother stated, "I'm completely okay with him sending letters to [Child] and keeping in touch. But if he continues to say those things to [Child], I won't be sharing them with her for her best interest." With Father attending church at the Westmoreland County Prison, it would not be unreasonable for him to seek the forgiveness of [C]hild for his wrong-doings. Nor did it appear improper for him to let [C]hild know that he had remorse for his past actions.
>
> No exact numbers of letters were provided to th[e c]ourt. Regardless of the frequency or contents of the letters, it is undisputed that Father maintained or intended to maintain contact with [C]hild via letters. Father testified that he did not pursue video chats or in-person visits with [C]hild because he reasonably believed that the prison environment was not suitable for [C]hild to be present in or to see/hear.

During Father's period of incarceration, he attempted to maintain phone contact with [C]hild. It is undisputed that Father did not make any attempts to contact [C]hild from October 2022 until May of 2023. The reason for this was not disclosed. Father testified that he believed that calls with [C]hild were to occur on the first Monday of every month[,] and Stepfather's testimony confirmed that belief. When Father called [C]hild, it was agreed that the calls would be made to Stepfather's phone. Stepfather testified to having multiple phone numbers. One number was Stepfather's work cell phone and the other was Stepfather's personal cell phone number. A third phone of Stepfather's was utilized but was later disconnected from service. Father called or attempted to call Stepfather's cell phone ending in digits 4690 on 3[7] occasions between May of 2023 and November of 2023. Father called or attempted to call another phone number for Stepfather ending in digits 7412 on 18 occasions between August of 2023 and July of 2024. One additional phone call was made to another one of Stepfather's cell phone[s] ending in digits 3536 on May 29, 2023[,] but the call was made from another inmate's account. It should be noted that approximately 4 of Father's attempted phone calls were made from other accounts in the prison. It is also noted that not all of Father's phone calls were successful. Many phone calls resulted as "not accepted," "inmate hung up," or "insufficient funds."

It is undisputed that Father had been unable to perform his parental duties while incarcerated and/or attending treatment at Greenbriar [after being released from incarceration]. Father continued to maintain contact with [C]hild through letters and phone calls. While Father did not ask for video calls or visits with [C]hild, Father had a justifiable reason for not doing so. Additionally, the [c]ourt finds that Father has worked to progress in his relationship with [C]hild between his periods of incarceration. Father attended church services at the prison and Narcotics Anonymous meetings. Father testified that he tried to participate in [other] programs offered through the prison but was unable to because of long waitlists or programs no longer being available. Upon release, Father has continued to participate in programs to address his substance abuse concerns and informed this [c]ourt that he is searching for employment.

*Id.* at 8-10 (footnotes omitted).

As indicated above, the orphans' court found that incarceration presented a barrier to Father's maintenance of his relationship with Child. *See id.* at 9; *see also In re Adoption of L.A.K.*, 265 A.3d at 593 (stating, "What constitutes a 'barrier' in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court"). The court also found that Father had not evidenced a settled purpose of relinquishing his parental claim to Child. OCO at 11. The court further observed:

> [C]hild expresses a desire to continue having contact with Father's side of the family. Mother testified that she has tried to maintain contact with Father's family. In 2023, [C]hild had visits with Father's family which included participating in a pottery class, a visit at Chuck-E-Cheese, and attending a cousin's birthday party. In January of 2024, [C]hild had one visit with Paternal Grandmother to celebrate her birthday and the Christmas holiday. Since that time, no more gatherings or visits have been arranged or have occurred with Father's family. …
>
> While it is clear that Father's periods of incarceration have impacted the parent-child relationship and have strengthened the bond between [C]hild and Stepfather, the [c]ourt does not find that it is in the best interest of [C]hild for Father's rights [to] be terminated at this time. It is clear that [C]hild is well cared for and is surrounded by loving and caring family members, individuals that have continued to be invested in [C]hild despite Father's period of incarceration. While [C]hild does not remember having contact with Father, Father has continuously attempted to put forth effort in order to maintain a relationship with [C]hild through letters and phone contact since May of 2023. With Father's recent release, he has not been given an opportunity to reestablish a relationship with [C]hild and no evidence was presented that would indicate any detriment to [C]hild by reestablishing a relationship with Father.

*Id.* at 12-13.

The record supports the orphans' court's disposition. The court considered the evidence, including Father's absence from Child's life (due to incarceration and efforts toward maintaining sobriety), Father's attempts at post-abandonment contact (letters and phone calls), and the effect of termination on Child. Accordingly, the orphans' court did not err or abuse its discretion in finding that Appellants failed to prove grounds for termination under Section 2511(a)(1) and denying the petition to terminate Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 09/29/2025